**Affirm in Part, Reverse and Render in Part, and Opinion Filed August 20, 2013**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-11-01545-CV

**BROYHILL FURNITURE INDUSTRIES, INC.
AND RANDALL LAVERCOMBE, Appellants**
V.
**RANDY MURPHY AND DAVE SHAFFER
D/B/A SOUTHWEST FURNITURE BROKERS, Appellees**

On Appeal from the 44th Judicial District Court
Dallas County, Texas
Trial Court Cause No. 08-13276

## MEMORANDUM OPINION
Before Justices Francis, Lang, and Evans
Opinion by Justice Francis

We withdraw our opinion dated June 19, 2013, and vacate the judgment of that date. This is now the opinion of the Court.

Broyhill Furniture Industries, Inc. and Randall Lavercombe appeal the trial court's judgment in favor of Randy Murphy and Dave Shaffer d/b/a Southwest Furniture Brokers. Appellants claim there is no evidence to support the jury's oral contract and fraud findings and challenge the award of attorney's fees. In two cross-points, appellees contend the trial court erred by vacating the jury's award of attorney's fees and by not entering judgment on its claim for quantum meruit. We affirm in part and reverse and render in part.

In 1991, Murphy and Shaffer started SFB, a furniture liquidation business. The men opened a store in Tyler in 2007. In mid-July 2007, Bruce Poland, a Broyhill upholstery representative, stopped by the store and spoke with the men about doing a liquidation sale, referred to as a "Pop-up Sale," for Broyhill in Dallas. According to Poland, Broyhill had significant overstocks. In addition, Poland told them that Charlie and Tina Prenzi, a couple who had the exclusive right to sell Broyhill in the DFW area through their Home Collection Stores, had some old, slow-moving inventory they needed to turn into cash, and Broyhill wanted the Prenzis in on the sale. After Poland visited SFB, Lavercombe, vice president of sales, called Murphy and Shaffer and set up a meeting in Las Vegas to discuss the sale.

In late July, Murphy and Shaffer met in Las Vegas with Lavercombe, Poland, and Billy Joe Taylor, the case goods representative for Broyhill. Case goods are non-upholstery furniture items and include dining room and bedroom sets, dinettes, end tables, coffee tables, and other wood furniture. Fred Bates, a Broyhill consultant, was scheduled to attend the meeting but went to Dallas instead to look for a building to house the sale. The Broyhill people told Murphy and Shaffer that Broyhill had over $20 million of overstocked and discounted merchandise to sell and SFB was the only promoter being considered for the liquidation sale. When Murphy and Shaffer told Lavercombe their fee was 10% commission on gross sales, he agreed. The three men also agreed merchandise was to be sent on consignment, meaning Broyhill would ship the merchandise, tell SFB what price Broyhill wanted, and SFB would sell it. The merchandise still belonged to Broyhill and, if it did not sell, it would be returned to Broyhill. And they agreed merchandise would be shipped within three working days of orders. The parties discussed starting the sale in September, envisioning it would last about five months. Lavercombe said Bates would also help with securing favorable advertising rates for the sale.

In August, about two weeks after the Las Vegas meeting, Murphy and Shaffer met with Lavercombe and Tina and Charlie Prenzi in Addison. Contrary to what Poland told Murphy and Shaffer, the Prenzis did not have an exclusive dealership right to Broyhill products. Nevertheless, the Prenzis' participation in the Pop-up Sale was considered necessary because they had a large Broyhill presence in the DFW area. Although the Prenzis agreed to participate in the sale, they did not want to pay SFB a 10% commission on their sales. Lavercombe again said there was over $20 million of Broyhill furniture that needed to be liquidated. Shaffer and Murphy offered to bring in other merchandise, items that Broyhill did not make, including grandfather clocks, recliners, Oriental rugs, and mattresses.

In late September or early October, Chris Canipe, the manager of the credit department at Broyhill, told Murphy he could not get Broyhill goods on consignment, that consignment was a "dirty word . . . in the credit area." Canipe said Murphy would have to buy the furniture on credit. Although Murphy asked for terms of 120 days to pay, Canipe said he would give him 90 days. Canipe drew up a security agreement and sent it to Murphy to sign. Murphy then called Lavercombe and said "there were problems, and the deal was consignment." Lavercombe assured Murphy "the deal's consignment," explaining that the credit department just wanted to invoice it, telling Murphy to treat it as a "memo bill." A memo bill is a document used to track inventory in a consignment sale arrangement that appears to be an invoice but is not intended to be paid. Murphy repeated that it had to be consignment, and Lavercombe agreed. Ultimately, both Murphy and Shaffer signed the security agreement which had a personal guarantee of $400,000. Murphy said he treated the security agreement as only a personal guarantee. He believed Broyhill wanted the security agreement because, for a period of time, SFB would have both the merchandise and the money from any sales; therefore, the security agreement gave

Broyhill the assurance that SFB would pay Broyhill the proceeds from the sales of Broyhill's inventory.

Although Murphy and Shaffer had wanted to start the sale in September, there were significant delays. When the building Bates had in mind was no longer an option, Lavercombe recommended a friend who was a commercial real estate broker to secure a location for the sale. The broker went on a one-month vacation before locating a building in Grapevine that was suitable. The Prenzis signed the lease, dated November 1, which was guaranteed by Broyhill. The building required substantial work to convert it to a 50,000-square-foot showroom, 60% of which was to be dedicated to Broyhill merchandise. The building finally received a certificate of occupancy in late November and, although both Murphy and Shaffer said it was a "terrible time of year" to conduct a furniture liquidation sale, they scheduled the sale, at Lavercombe's insistence, to open December 8.

In early November, while waiting for the building to be ready, Shaffer contacted personnel in Lane, a division of Broyhill, and ordered approximately $400,000 worth of merchandise. Around the end of November, two representatives for Lane dropped by the showroom and told Shaffer that they would not be shipping the Lane merchandise he had ordered. They assured Shaffer it had nothing to do with SFB's "integrity" or "credit." Shaffer and Murphy pulled merchandise out of their Tyler store to supplement the sale when Lane cancelled.

On December 7, Poland sent an email to the Fort Worth Star Telegram with an attachment announcing the Pop-up Sale. The attachment, a letter approved and signed by Jeff Cook, the president of Broyhill, announced the Pop-up Sale, stating it was to "liquidate over $20 million in quality home furnishings at or near wholesale dealer cost." According to the letter, the

merchandise included discontinued collections, overstocks, and market samples, but did not include factory seconds. Shaffer explained wholesale dealer cost in terms of the pricing at the sale, using a sofa as an example. If Broyhill consigned the sofa to SFB for $500, the cost to the public would be the wholesale price of $1000. The consignment price of $500 would be paid to Broyhill. Of the remaining $500, $100 was commission to SFB, and $50 was a 5% sales commission to the individual salesperson who made the sale of the piece of furniture. After deductions for certain expenses, including advertising and the building lease, the residual profit flowed to the Prenzis.

Murphy did not want to start the sale shortly before Christmas, but Lavercombe told him to do so or Broyhill would "hold the merchandise." From the beginning, SFB had problems getting merchandise from the Broyhill factory in North Carolina. Although the agreement had been merchandise would ship within three working days of orders being placed, weeks would pass without SFB receiving shipments on orders. At times, only partial orders would arrive. These problems persisted throughout the sale. According to Taylor, SFB would place an order for fifty bedroom suits and Broyhill would ship between twenty to thirty suits. Of those that shipped, many were missing pieces, such as chests and nightstands. Dining room sets arrived without china cabinets; entertainment centers and other sets arrived with parts missing, making them impossible to sell. Taylor said they lost sales because they did not get the furniture they needed; simply put, "the merchandise wasn't there." He would not "point fingers and say it was [Cook's] or [Lavercombe's fault], but it didn't all come in."

Broyhill had a "Vintage World" line and a "100th Anniversary" line. The quantities available were "staggering," and Murphy said it was a "good selling suit." Murphy and Shaffer brought the ones they had from Tyler for the sale and tried to order more from Broyhill, but the

company delivered only "three or five suites." In early February, Murphy and Shaffer learned that Big Lots was advertising a sale purporting to have the same $20 million in Broyhill goods that SFB had been promised. The Big Lots advertising specifically showed the 100th Anniversary line.

According to Murphy, they tried to order all the furniture they needed for the sale but just could not get it. By the end of May, the sale ended; in June, SFB held an auction of the remaining merchandise. All proceeds on Broyhill merchandise went to Broyhill because it was sold on consignment; likewise, sales on other merchandise went to those vendors. After the auction, unsold Broyhill furniture that remained in wrapping was sent back to Broyhill. Approximately $175,000 worth of merchandise that was out of the wrapper and on the floor went to SFB's warehouse in Tyler because Broyhill would not take it back.

Appellees sued appellants for breach of contract, quantum meruit, and fraud, among other claims not relevant to this appeal, and they requested attorney's fees. Following a jury trial, the trial court entered judgment on the verdict. After appellants filed numerous post-judgment motions, the trial court entered its final judgment awarding appellees $455,000 from Broyhill for breach of contract and $100,000 from Lavercombe for fraud; both awards conformed to the jury verdict. Although the jury awarded appellees $690,000 in attorney's fees for trial, $131,250 in the event of an appeal to the court of appeals and $112,500 in the event of an appeal to the supreme court, the trial court reduced these amounts to $460,000, $30,000, and $20,000 respectively. Both sides appealed.

In their first issue, appellants claim we must reverse the $455,000 judgment based on breach of oral contract for services because no oral agreement existed. They alternatively argue that, even if an oral agreement did exist, it was superseded by the written security agreement or

barred by the statute of frauds. Finally, appellants contend appellees failed to prove they sustained any damages as a result of Broyhill's failure to comply with the oral agreement. Appellants do not, however, complain about the evidence supporting the finding of a breach of contract.

When, as here, appellants attack the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that no evidence supports the finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010).

Although appellants claim there is no evidence to support the jury's finding of an oral contract for services between Broyhill and SFB, we disagree. During trial, Shaffer, Murphy, Charlie Prenzi, and Taylor each testified SFB was approached by Lavercombe and asked to sell Broyhill products that were overstocks, discontinued, and market samples at the Pop-up Sale. According to all four men, Lavercombe agreed that SFB would sell the products in exchange for a 10% commission on sales. Shaffer, Murphy, and Taylor testified Lavercombe agreed the merchandise would be sold on consignment and that Broyhill would take back any remaining inventory at the end of the sale. Taylor remembered that Lavercombe said there would be plenty of inventory, and he wanted the sale to start as soon as possible. The evidence also shows Broyhill told SFB it had in excess of $20 million in "quality home furnishings" that it needed to liquidate at the Pop-up Sale. Broyhill contacted the real estate broker who found the location,

and Broyhill guaranteed the lease. Sixty percent of the leased space was dedicated to merchandise of Broyhill brands and lines. The parties discussed the sale lasting approximately five months. Although Lavercombe denied he agreed to the 10% commission, he conceded his memory about meetings and negotiations was not clear so others who were present at the meetings might have better recollection of details. He also told Murphy that, despite the security agreement, the merchandise was on consignment.

During trial, certified public accountant Stephanie Anderson testified without objection as an expert witness for appellants. Anderson reviewed the documents produced as well as certain testimony in formulating her opinions, including emails from Lavercombe to Poland, Taylor, and other Broyhill personnel. She noted that, when discussing shipping furniture to SFB, Lavercombe used the phrase "memo bill" which "would typically be an accounting document that recorded the inventory was sent on consignment or, in other words, that it was not sold until some condition had been met." Anderson also said that when parties use memo bills, invoices or receipts may not accurately reflect the true terms or arrangement between the parties. Another significant factor in determining whether the sale was a consignment sale was that Broyhill took back four to six truckloads of furniture. According to Anderson, under Generally Accepted Accounting Principles, a product is not considered sold if there is a right of return. This evidence led Anderson to the opinion that Broyhill contracted for SFB's services to sell furniture and Broyhill inventory was sent on consignment to the Pop-up Sale.

This, along with other evidence at trial, shows Broyhill contracted with SFB to perform a service—manage a liquidation sale event—for a 10% commission and that the merchandise would be sent on consignment. Because appellants failed to demonstrate there was no evidence

supporting the finding of (1) an oral contract that (2) was predominantly for services, we overrule these portions of their first issue.

Appellants also contend the oral contract was superseded by the written security agreement because the agreements "are between the same parties" and "deal with same subject matter."

A party raising the affirmative defense of novation has the burden prove (1) the validity of a previous obligation; (2) an agreement between the parties to accept a new contract; (3) the extinguishment of the previous obligation; and (4) the validity of the new agreement. *Vickery v. Vickery*, 999 S.W.2d 342, 356 (Tex. 1999). "The substitution of a new agreement occurs when a later agreement is so inconsistent with a former agreement that the two cannot subsist together." *Scalise v. McCallum*, 700 S.W.2d 682, 684 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Absent inconsistent provisions, a second contract will operate as a novation of a first contract only when the evidence establishes that the parties to both contracts intend and agree "the obligations of the second shall be substituted for and operate as a discharge of the obligations of the first." *Chastain v. Cooper & Reed*, 152 Tex. 322, 325, 257 S.W.2d 422, 424 (1953). Whether a subsequent agreement works a novation of the first is a question of intent. *Fulcrum Cent. v. AutoTester, Inc.*, 102 S.W.3d 274, 277 (Tex. App.—Dallas 2003, no pet.). A novation is never presumed; it must be clear that the parties intended a novation. *Id.* In the absence of an express agreement, whether a new contract operates as a novation of an earlier contract is "usually a question of fact, and can only become a question of law when the state of the evidence is such that reasonable minds cannot differ as to its effect." *Chastain*, 152 Tex. at 325, 257 S.W.2d at 424.

The party raising the defense must plead it as well as submit a jury question in proper form. *See* TEX. R. CIV. P. 278, 279. Ordinarily, a defense is waived if the party relying on it fails to submit an issue. TEX. R. CIV. P. 279. This rule applies in all cases except when the defense has been conclusively established. *Pope v. Darcey*, 667 S.W.2d 270, 274 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Because Broyhill did not attempt to submit the defense of novation now asserted on appeal, the company has waived the defense unless it was conclusively established. *See Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 343 (Tex. App. —Austin 2004, no pet.).

The evidence shows that, in November, the manager of Broyhill's credit department told Murphy that SFB could not order and receive merchandise on consignment. He then sent a security agreement to Murphy to sign which provided for the sale of merchandise on credit. Upon receiving the security agreement, Murphy spoke with Lavercombe. Murphy reminded Lavercombe that SFB had agreed to run the liquidation sale for a commission and "the deal was consignment." Lavercombe assured Murphy that nothing had changed, the deal was, in fact, consignment, and that Murphy should treat it as a "memo bill." Murphy understood the agreement was to assure Broyhill that although SFB had both the merchandise and the money from the sales, SFB would pay Broyhill the proceeds from the sales. Murphy and Shaffer both signed the agreement, treating it as a personal guarantee. In light of this and other evidence adduced at trial, Broyhill did not establish as a matter of law that the security agreement superseded the oral consignment agreement. Under these circumstances, we conclude this ground is waived. We overrule this portion of appellants' complaint under their first issue.

Next, appellants argue we must reverse the jury's verdict because the statute of frauds was not satisfied by the agreement. The business and commerce code provides:

> Except as otherwise provided in this section a contract for the *sale of goods* for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

TEX. BUS. & COM. CODE ANN. § 2.201 (West 2009) (emphasis added).

As detailed above, the jury found, and we have concluded the evidence is legally sufficient to support the finding that the oral contract was for goods and services, with the services portion being the dominant factor. Under these circumstances, the oral agreement was not barred by the statute of frauds. *See id.* We overrule this argument under appellants' first issue.

Finally, appellants argue the evidence is legally and factually insufficient to support the $445,000 damage award for breach of contract. Appellants do not challenge the jury's finding that Broyhill failed to comply with the agreement, nor do they argue an inappropriate measure of damages was employed. Rather, they argue only there is no evidence showing SFB could have sold any amount in excess of what it actually did. In support of this argument, appellants point to evidence that SFB ordered $2.27 million in furniture from Broyhill, took delivery of $1.6 million in furniture, and returned several truckloads at the end of the sale.

Generally, the measure of damages for breach of contract is that which restores the injured party to the economic position it would have enjoyed if the contract had been performed. *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Sci., Inc.*, 128 S.W.3d 304, 317 n.6 (Tex. App.—Dallas 2004, no pet.). The benefit of the bargain is measured by the prevailing party's anticipated receipts and losses caused by the breach less any cost or other loss it has avoided by not having to perform. *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 889 (Tex. App.—Dallas 2004, pet. denied). "A party who breaks his contract cannot escape liability merely because it is impossible to state or prove a perfect measure of damages." *Sw. Battery*

*Corp. v. Owen*, 131 Tex. 423, 428, 115 S.W.2d 1097, 1099 (1938). We distinguish between uncertainty as to the fact of damages, which may preclude recovery, and uncertainty as to the amount of damages, which will not defeat recovery. *Id.* When, as here, the fact of damages is clear, the plaintiffs are required to prove their damages with "reasonable certainty." *Qaddura*, 141 S.W.3d at 890 (citing *Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2*, 415 S.W.2d 890, 897 (Tex. 1967)).

Although appellants argue we must assume SFB is not entitled to any damages because SFB did not sell all the furniture it received, this logic ignores that the jury was asked to determine what appellees would have earned but for Broyhill's failure to comply with the agreement. The jury heard evidence that Broyhill represented it had over $20 million of inventory to sell. Broyhill assured SFB there was sufficient inventory, in fact, "there would be plenty" of quality inventory for the sale, and that SFB was the only promoter being considered for the liquidation sale. Although SFB had not done a sale of this magnitude before, it had managed a sale of $5 million in furniture.

According to Taylor, the first three or four weeks of the sale were good, but thereafter, things fell apart. SFB placed orders, many of which were cancelled. Orders that did arrive had incomplete and broken suits. People who ordered bedroom suits later discovered there were no nightstands or chests. Taylor drove around, looking for parts to complete the suits. He stated the obvious—it is not easy "to sell imbalanced suits." Murphy sent a letter to Lavercombe asking for help. He listed the issues, including orders not shipping as well as orders being cancelled, but Lavercombe did not respond. By February, it was clear there was an imbalance in inventory, and the sale was not going well. In spite of all this, Shaffer testified they sold $4.5 million during the sale.

In addition, the jury heard Anderson's testimony in which she provided a formula to assist in determining damages: the amount of sales the Pop-up Sale would have generated but for appellants breach multiplied by the 10% commission, less the $145,000 already paid to appellees. Using this formula, Anderson stated if the jury believed SFB could have sold all the furniture Broyhill claimed it had available, SFB would have earned $1.855 million in commissions.

To award $455,000, the jury had to find that, but for Broyhill's breach, SFB would have sold $6 million ($6 million multiplied by 10% less $145,000). From the evidence in the record, some of which is detailed above, the jury could have reasonably concluded that, but for Broyhill's failures to comply with the agreement, SFB would have sold more furniture than what it did. We also note that the jury also could have reasonably concluded SFB could not have sold the full $20 million Broyhill wanted it to sell, particularly in light of the evidence that Broyhill had Big Lots sell furniture in competition with the Pop-up Sale, despite Broyhill's representation to SFB that it was the only promoter being considered for the liquidation sale. After reviewing the entire record, we conclude there is evidence in the record to support the jury's finding, and that finding is not against the great weight and preponderance of the evidence. *See Gulf States Util. Co.*, 79 S.W.3d at 566 (jury has discretion to award damages within range of evidence presented at trial); *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 761 (Tex. App.—Dallas 2008, no pet.) (explaining that jury has broad discretion to award damages within range of evidence presented at trial as long as rational basis exists for calculation). We overrule appellants' first issue in its entirety. In light of our disposition of this issue, we need not address appellants' fourth issue or appellees' second cross-point, both of which address appellees' quantum meruit claim.

In their second issue, appellants contend we must reverse the $100,000 judgment against Lavercombe based on fraud. Appellants argue there is no evidence or factually insufficient evidence that Lavercombe made any misrepresentation with intent "never to perform the contract at the time the contract was made." Alternatively, appellants claim there is no evidence to support the damage award. Finally, they argue any damages against Lavercombe are subsumed in those awarded against Broyhill and are therefore barred under the "single injury-one satisfaction" rule.

Again, we review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Del Lago Partners, Inc.*, 307 S.W.3d at 770. To address a factual sufficiency challenge, we must consider and weigh all of the evidence and should set aside a fact finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We must conduct a meaningful review and if, after doing so, we determine the evidence is factually insufficient, we must "detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

A fraud cause of action requires "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47–48

(Tex. 1998). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Id*. at 48. The mere failure to perform a contract, however, is not evidence of fraud. *See id*. Rather, appellees had to present evidence that Lavercombe made representations with the intent to deceive and with no intention of performing as represented. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). And the evidence presented must be relevant to Lavercombe's intent at the time the representation was made. *Id*.

Appellants claim the evidence is legally and factually insufficient to support the jury's finding that Lavercombe committed fraud against SFB with respect to the contract. In response, appellees assert that, contrary to appellants' brief and argument, appellees' claim for fraud was that Lavercombe made a material representation as to the quantity and availability of certain upholstery products, knew the representation was false when he made it, and intended SFB rely on it, and that SFB canceled another order in reliance, "thereby suffering injury."

With respect to the facts raised by appellees' claim for fraud, the evidence at trial shows Murphy ordered upholstery and case goods from Home Elegance to sell at the Pop-up Sale. According to Murphy, when he told Lavercombe about the order, Lavercombe said they had found $1 million dollars of "cut and sewn" goods in the Broyhill line and asked Murphy to cancel the Home Elegance order. Murphy said he agreed to cancel the order because he realized that $1 million dollars in Broyhill goods "equated to over $3 million" in sales.

Lavercombe denied telling or asking Murphy to cancel the Home Elegance order. When asked whether there was plenty of upholstery goods or whether he was "just telling him that," Lavercombe replied, "Oh, we had — you can make upholstery fast." The emails discussing the subject verify that Lavercombe told Murphy they had "come up with about a million dollars

15

worth of upholstery [they wanted] him to use." However, nothing in Lavercombe's or Murphy's testimony or the emails between Lavercombe, Poland, Taylor, and other Broyhill personnel shows that when Lavercombe told Murphy about the upholstery, he misrepresented either the quantity or availability of the products or that he did not intend to ship the products to SFB. Because there is no evidence in the record showing (1) Lavercombe made a material misrepresentation as to the quantity and availability of upholstery products, (2) the statement was made with knowledge of its falsity or made recklessly without any knowledge of the truth, or (3) that Lavercombe made the representations with the intent to deceive and with no intention of performing as represented, we sustain appellants' second issue and render judgment that appellees take nothing on their fraud claim against Lavercombe.

In their third issue, appellants claim we must reverse the award of attorney's fees because appellees cannot prevail on their breach of contract claim. Having overruled appellants' first issue, we need not address this argument. Also under this issue, appellants argue the trial court abused its discretion by overruling appellants' pretrial motion to strike appellees' evidence of attorney's fees, thereby allowing appellees' counsel to provide expert testimony on the same.

We review the trial court's denial of the motion to strike expert witness testimony for an abuse of discretion. *Olympic Arms, Inc. v. Green*, 176 S.W.3d 567, 585 (Tex. App.—Houston [1st Dist.] 2004, no pet.). In such a review, we look to whether the trial court made its ruling without reference to any guiding rule or principle. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000).

Rule 193.6(a) provides that a party who "fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed" or "offer the testimony of a witness" who was not timely identified. TEX.

R. CIV. P. 193.6(a). However, if the court finds good cause exists "for the failure to timely make, amend, or supplement the discovery response" or that the failure to do so will not unfairly surprise or unfairly prejudice the other party, rule 193.6 allows the trial court to admit the evidence. *Id*. The purpose behind this rule is to prevent trial by ambush. *Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 860 (Tex. App.—Dallas 2006, no pet.). The party seeking to introduce the evidence has the burden of establishing good cause and lack of unfair surprise or prejudice. TEX. R. CIV. P. 193.6(b). The court may grant a continuance or temporarily postpone the trial to allow the opponent to conduct discovery regarding any new information presented by the discovery response. *See* TEX. R. CIV. P. 193.6(c).

Since filing their original petition in October 2008, appellees sought attorney's fees in connection with this lawsuit. In their September 17, 2010 Third Amended Responses to Defendants' requests for Disclosure, appellees designated Michael Richardson of Rose Walker, LLP as an expert witness on attorney's fees. Over one month later, in their Objections and Responses to Defendants' Second Requests for Production, appellees stated they would supplement discovery with all documents supporting attorney's fees. On April 29, 2011, appellees filed a trial witness list including M. Ross Cunningham and Martin E. Rose as experts who would testify as to reasonable and necessary attorney's fees.

On May 5, 2011, appellants filed a pretrial motion to strike experts and exclude evidence, claiming appellees "failed to properly or timely designate an expert witness," "have never produced their attorneys' fee statements," and failed "to produce any expert report on attorney's fees." Appellants specifically complained the April 2011 designation of trial counsel Cunningham and Rose as experts who would testify was untimely and provided insufficient

information, and that the attorney's fees statements should be excluded because they had never been produced.

Appellees produced redacted fee statements May 10, 2011, followed by a response to appellants' motion in which they stated good cause existed for the late designation of Cunningham and Rose. Appellees argued they timely designated Richardson as an expert witness on attorney's fees but needed to substitute under rule 193.5(b) when Richardson left the law firm. With respect to the redacted fee statements filed two weeks before trial, appellees argued they were produced sufficiently far enough in advance of trial as not to constitute surprise or unfair prejudice. Appellees reasoned that appellants' counsel, who had represented appellants since the inception of the case, would be "well aware of the amount and general nature of work performed by both sides." The only information contained in the bills of which appellants' counsel was not already aware was the "actual amount of time spent on each task, and the rates charged, to produce the specific amount of fees sought." Appellees also noted that, although it was unlikely a deposition could shed any light on the reasonableness of those fees, they were willing to accommodate that request. The record before us does not, however, contain a request from appellants for a deposition or a motion to postpone trial. After considering "the motion, response, and argument of counsel," the trial court denied appellants' motion.

Although appellants contend the trial court's order was an abuse of discretion, we cannot agree. The trial court's ruling in this case was supported by rule 193.6. Appellees response to appellants' motion presented good cause for the substitution of counsel and argued the lack of unfair surprise or prejudice with respect to the fee statements. Appellants did not seek additional time nor did they present argument or contrary evidence of unfair surprise or prejudice. Under these circumstances, we cannot conclude the trial court abused its discretion. *See Beard Family*

*P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 850 (Tex. App.—Austin 2003, no pet.) (admitting expert testimony on attorney's fees despite untimely designation not abuse of discretion; the trial court found good cause to allow expert to testify and found no unfair surprise or prejudice because pleadings contained request for attorney fees from lawsuit's inception).

In their first cross-point, appellees contend the trial court erred by reducing the amount of attorney's fees awarded by the jury from $933,750 to $510,000.

On August 1, 2011, following the jury verdict, the trial court signed a final judgment, awarding $690,000 in attorney's fees, along with $131,250 and $112,500 in the event Broyhill unsuccessfully appealed to the court of appeals and the supreme court respectively. Broyhill moved for judgment notwithstanding the verdict and filed a motion of new trial, in part, on appellees' claim for attorney fees. On October 14, 2011, after having "entertained" Broyhill's motions, the trial court vacated the August 1, 2011 judgment in its entirety and awarded $460,000 in reasonable and necessary attorney's fees for preparation and trial, along with $30,000 and $20,000 in the event Broyhill unsuccessfully appealed to the court of appeals and the supreme court respectively. The remainder of the judgment was unchanged from the August 1, 2011 judgment.

We first note that the trial court's October 2011 judgment states "In addition to the recovery above, the Court suggests a *remittitur for attorney fees* as follows . . . ." The judgment does not, however, condition the remittitur on a new trial, and nothing in the record shows the trial court presented a proper suggestion of remittitur before rendering the October 2011 judgment. Appellees argue, and appellants concede, that the trial court had no power to order a remittitur without conditioning it on a new trial. *Snoke v. Rep. Underwriters Ins. Co.*, 770 S.W.2d 777, 777 (Tex. 1989). When a trial court orders a reduction in damages but does not

condition the reduction on a new trial, the order necessarily modifies the judgment regardless of whether it is incorrectly called a remittitur. *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 390 (Tex. 2008).

A trial court may order a remittitur only if "the evidence is factually insufficient to support the verdict." *In re Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d 204, 210 (Tex. 2009). Thus, when reviewing a trial court's remittitur, we do so under a factual sufficiency standard. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987). As noted previously, we consider all of the evidence in the record to determine whether sufficient evidence supports the award. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986) (per curiam). We must keep in mind it is the jury's role, not ours, to judge the credibility of the evidence, to determine the weight to be given to witnesses' testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). No court is free to simply substitute its judgment for that of the jury. *In re Columbia Med. Ctr.*, 290 S.W.3d at 210. We will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. If a court of appeals affirms a challenged jury verdict as being supported by factually sufficient evidence, the court need not detail all the evidence in support of the verdict. *In re Columbia Med. Ctr.*, 290 S.W.3d at 211.

The record shows appellees hired the law firm of Rose Walker on September 25, 2008. Cunningham, lead counsel, testified about the amount of work involved during the two years and nine months before trial including document production in excess of 61,000 pages and 2750 billable hours by attorneys and paralegals. According to Cunningham, the case was complicated by the existence of the oral contract which presented "unique and novel" issues. Cunningham

stated he was familiar with the fees and rates customarily charged by lawyers and paralegals in the Dallas area. In his opinion, the services provided by Rose Walker were necessary and the fees charged for those services were reasonable for the Dallas marketplace in light of the work done in the case. Cunningham stated a reasonable fee for the legal services provided by Rose Walker in this case was $920,000 in attorney's fees. In addition, Cunningham testified there were expenses of $130,000 for, among other things, expert fees, deposition fees, travel expenses, filing fees, and court reporter costs. He also testified that $175,000 and $150,000 were reasonable expectation for attorney's fees on appeal to the court of appeals and supreme court respectively.

In contrast, Price Johnson testified that, in his opinion, this case was a routine contract case, and Rose Walker had an "inordinate [number] of people" working on the case which resulted in higher than necessary fees. Johnson opined that the fees were not reasonable or necessary, not only because there were too many lawyers involved, but also because they spent too many hours working on the case. According to Johnson, Rose Walker charged $17,000 for preparing and filing the original petition but he believed it should have cost around $3,000. He believed the total time preparing and taking Lavercombe's deposition should not have exceeded $10,000; Rose Walker charged $46,500. Johnson stated a reasonable amount of attorney's fees "would be probably half" what Rose Walker charged. Johnson also believed $25,000 to $30,000 was a reasonable amount of attorney's fees in the event of an appeal to the court of appeals.

The jury heard conflicting evidence about the appropriate amount of attorney's fees, with ranges of $460,000 to $920,000 for trial, $30,000 to $175,000 for an appeal to the court of appeals, and $15,000 to $150,000 for an appeal to the supreme court. The jury awarded $690,000 in attorney's fees for trial, an amount well within the two amounts provided by the

testifying expert witnesses. Likewise, the jury awarded $131,250 in the event of an appeal to the court of appeals and $112,500 in the event of an appeal to the supreme court, again, amounts within the ranges presented at trial. After reviewing the entire record, we conclude these awards are not so against the great weight and preponderance of the evidence as to be manifestly unjust. Therefore, the trial court erred by granting appellants' remittitur on attorney's fees. We therefore sustain appellees' first cross-point and render judgment reinstating the jury's award of attorney's fees. *See Wal-Mart Stores, Inc.*, 102 S.W.3d at 710.

We reverse the trial court's judgment with respect to fraud and render judgment that appellees take nothing on their fraud claim against Lavercombe. We reverse the trial court's judgment with respect to attorney's fees and render judgment, reinstating the jury's findings awarding appellees $690,000 in attorney's fees for trial, $131,250 in the event of an appeal to the court of appeals, and $112,500 in the event of an appeal to the supreme court. In all other respects, we affirm the trial court's judgment.

111545F.P05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BROYHILL FURNITURE INDUSTRIES
AND RANDY LAVERCOMBE, Appellants

No. 05-11-01545-CV     V.

RANDY MURPHY AND DAVE
SHAFFER, Appellees

On Appeal from the 44th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 08-13276.
Opinion delivered by Justice Francis,
Justices Lang and Evans participating.

We **VACATE** our judgment dated June 19, 2013.

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's judgment with respect to fraud and **RENDER** judgment that appellees take nothing on their fraud claim against Lavercombe. We **REVERSE** the trial court's judgment with respect to attorney's fees and **RENDER** judgment, reinstating the jury's findings awarding appellees $690,000 in attorney's fees for trial, $131,250 in the event of an appeal to the court of appeals, and $112,500 in the event of an appeal to the supreme court. In all other respects, we **AFFIRM** the trial court's judgment.

Judgment entered August 20, 2013

/Molly Francis/
MOLLY FRANCIS
JUSTICE